UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WILLIAM DEITRICK, JR.,

            Plaintiff,

– *against* –

CIBOLO CAPITAL PARTNERS I, LLC,
*and* TG LLC,

            Defendants.

**OPINION & ORDER**

17 Civ. 4165 (ER)

RAMOS, D.J.:

      William Deitrick had a deal with the Gypsy Guitar Corporation.[1] They agreed that he would find the company an investor and, in return, he would be paid 20 percent of the invested amount through cash and stock options. Deitrick did find an investor for Gypsy, Cibolo Capital Investments I, LLC, and Cibolo made significant progress towards completely acquiring the company through a subsidiary, TG, LLC. The purchase, however, fell apart about a year after TG and Gypsy signed an initial agreement. TG and Gypsy thereafter unwound the transaction, signed a settlement, and went their separate ways.

      Deitrick never received compensation for finding Cibolo, despite having a still-valid engagement letter with Gypsy. So, he has brought this action in federal court to recover his fees from Cibolo and TG, alleging: (1) that Cibolo breached a non-disclosure agreement by communicating with Gypsy without his consent; (2) that TG assumed the liabilities within his engagement letter with Gypsy and is thus liable for his fee; (3) that both defendants tortiously interfered with his contract with Gypsy; and (4) that both

---

[1] Although Gypsy is not a defendant in this action, a related case, *Deitrick v. Gypsy Guitar Corp.* No. 16 Civ. 616 (ER) (S.D.N.Y.), is pending before this Court.

defendants were unjustly enriched by his services.[2] First Am. Compl., Doc. 27. After discovery, Cibolo and TG have moved under Federal Rule of Civil Procedure 56 for summary judgment and dismissal of all claims. Because the Court finds that Deitrick's true dispute is with Gypsy, it GRANTS the motion in its entirety.

I. BACKGROUND

Teye Wijnterp and Evert Wilbrink founded the Gypsy Guitar Corporation in 2006 to design, produce, and sell high-end electric guitars. Decl. of M. Todd Mobley ("Mobley Decl.") Ex. 1 ("PPM") at CIBOLO_62489, Doc. 45. By the beginning of 2013, Gypsy had begun to seek a capital infusion of about $3 million to expand its operations and launch a new line of mass-market guitars. *Id.* Wijnterp and Wilbrink approached William Deitrick, an investment banker, for assistance in finding an investor and structuring the transaction. Decl. of Evert Wilbrink ("Wilbrink Decl.") ¶¶ 1, 2, Doc. 48.

### A. The Agreements of Gypsy and Cibolo with Deitrick

Gypsy and Deitrick signed an engagement letter detailing the terms of their relationship.[3] Mobley Decl. Ex. 2 ("Engagement Letter"). Of note, the letter provided for a "Placement Fee" equivalent to 20% of the amount of capital raised — half in cash and half in stock options. Engagement Letter § 3(b). The stock options would "be earned as of . . . the date of the first closing" of the transaction, and the cash would be "paid . . . contemporaneously with the closing" of the transaction. *Id.* The letter also allowed for

---

[2] Deitrick is a citizen of New York. TG is a limited liability company with two members: Win Purifoy and Will Howard, both citizens of Texas. Cibolo is a limited liability company with three members: Purifoy, Howard, and Red Star Ci Interests, LLC, a Texas limited liability company. Red Star's members, and their own constituent members are all citizens of Texas. *See* Joint Decl. of Citizenship of Members of Party Limited Liability Companies (Jan. 23, 2020), Doc. 60. This Court has subject matter jurisdiction under 27 U.S.C. § 1332 because the parties are completely diverse and the amount in controversy is greater than $75,000.

[3] Gypsy and Deitrich signed an initial agreement in April 2012 while Deitrich was employed by New Oak Capital Markets, LLC. Decl. of Matthew J. Press ("Press Decl.") Ex. 4, Doc. 50. Deitrick later left New Oak, and so, in July 2013, the parties signed another, identical, engagement letter, which serves as the operative agreement today. Press Decl. Ex. 1; Wilbrink Decl. ¶ 5; Mobley Decl. Ex. 2.

2

Deitrick to earn an identical "Facilitation Fee" should Gypsy raise capital or sell assets with an entity introduced by Deitrick without Deitrick functioning as broker. *Id.* § 3(e). The letter forbid Gypsy from dealing directly with entities introduced by Deitrick without Deitrick's written consent. *Id.* § 7. It indicated that New York law would govern "all claims or causes of action . . that may be based upon, arise out of or relate to [the engagement letter], or the negotiation, execution or performance of [the letter]." *Id.* § 10.

After signing the engagement letter, Deitrick began to market the Gypsy investment opportunity through his network, describing the company as a "High End Guitar Manufacturer." Decl. of Matthew J. Press ("Press Decl.") Ex. 6, Doc. 50. Cibolo learned of the opportunity and reached out to Deitrick in April 2013. *Id.* In May, Deitrick introduced Cibolo to Gypsy and the due diligence process began. Mobley Decl. Ex. 7. Deitrick initially pitched the investment as a chance to purchase a 40 percent interest in the company for $3 million, valuing the company at $7.5 million. PPM at CIBOLO_62489.

Cibolo and Deitrick first signed a non-disclosure agreement[4] that protected from disclosure any confidential information that came from the negotiation of the investment into Gypsy. Mobley Decl. Ex. 19 ("NDA") § 1. Like the engagement letter signed by Gypsy, the non-disclosure agreement forbid Cibolo from dealing directly with Gyspy without Detrick's written consent. NDA § 5. It also dictated the following regarding damages that may be recovered:

> No party shall be liable to another party for any indirect, special, incidental, consequential, punitive or exemplary damages of any kind (including without limitation lost revenues, loss of profits, or loss of business) arising from this Agreement or its breach or purported breach.

---

[4] According to Deitrick, Cibolo actually signed two non-disclosure agreements: one in April and another in September when the April agreement was lost. Press Decl. Ex. 9 at 15–16. Only the September agreement has been produced in discovery, and the defendants dispute its authenticity. Mem. of Law in Support at n.3, Doc. 44. For the purposes of this motion, however, the defendants assume it is authentic. *Id.*

3

NDA § 11.

### B. Initial Diligence and Negotiations

As due diligence progressed during the summer of 2013, Cibolo executives communicated frequently with Gypsy's founders, Wijnterp and Wilbrink, as well as Deitrick. *See, e.g.*, Mobley Decl. Exs. 8–18. Deitrick forwarded Gypsy's financials and other documents to Cibolo, Press Decl. Exs. 7, 11, and Cibolo requested other documents contained within a "preliminary due diligence" list, Press Decl. Ex. 12. Cibolo also requested a copy of Deitrick's engagement letter with Gypsy. Press Decl. Ex. 13; Wilbrink Decl. ¶ 5.[5]

Occasionally, Deitrick would not be included in conversations between Cibolo and Gypsy; he made his objections known directly to Wilbrink. In one October 2013 email concerning one such missed meeting, for example, Deitrick admonished Wilbrink to "up [his] game" and make sure Deitrick had enough time to join meetings via phone- or video-conference. Mobley Decl. Ex. 46. Wilbrink responded that only technical details of Gypsy's guitars were discussed at the meeting Deitrick missed and that Deitrick's presence was not needed for such meetings. *Id.*

In a declaration filed with Deitrick's opposition to the motion for summary judgment, Wilbrink now claims that Cibolo executive Win Purifoy instructed him to "not speak with Mr. Deitrick . . . about the transaction. Instead, Mr. Purifoy insisted that [Wijnterp and Wilbrink] should deal directly with him and Cibolo." Wilbrink Decl. ¶ 9. According to Wilbrink, "Cibolo induced Gypsy to exclude Mr. Deitrick from various calls and in-person meetings, and Cibolo contacted Gypsy directly" during the due diligence process. *Id.*

Wilbrink claims that Purifoy offered to cover Deitrick's fee on at least three occasions between August and October 2013. Wilbrink Decl. ¶ 8. In Deitrick's

---

[5] Around the same time, Cibolo and Deitrick signed an engagement letter for an entirely different deal. This engagement letter was identical to the engagement letter between Gypsy and Deitrick. Press Decl. Ex. 14.

4

deposition, Deitrick described one of those times. In August 2013, Purifoy told Deitrick that he would be amenable to covering Deitrick's fee, but he wanted Deitrick to offer a bridge loan of $43,700 to Gypsy first. Press Decl. Ex. 3 ("Deitrick Dep.") 133:2–18; Wilbrink Decl. ¶ 10. Deitrick did make that loan the next month. Deitrick Dep. 134:5–7.

### C. The Asset Purchase Agreement

During the initial period of due diligence and negotiation, Cibolo decided to purchase Gypsy's assets outright, rather than purchasing a stake in the company for $3 million. An October 15, 2013 email from Purifoy to Wilbrink, Wijnterp, Deitrick, and several Cibolo executives outlined the deal. Mobely Decl. Ex. 35. Cibolo's investors would loan $800,000 to an entity created on October 10, Teye Guitars LLC in a "First Close." Teye Guitars (subsequently renamed TG LLC, the defendant in this litigation), would, in turn, loan money to Gypsy as needed for Gypsy's operations and to repay Deitrick's earlier loan. Then, in a "Second Close," Teye Guitars would purchase almost all of Gypsy's assets and would receive an investment of $1.7 million from a Cibolo subsidiary. Purifoy provided a draft asset purchase agreement two days later. Wilbank Decl. ¶ 13.

Wilbrink and Purifoy, in his capacity as an executive of TG, met in Dallas on October 18, 2013, at which time Wilbrink and Purifoy signed the asset purchase agreement. Wijnterp signed it a few days later. Neither Wilbrink nor Wijnterp were represented by counsel during the signing process, and no one invited Deitrick to participate in the signing in-person or over the phone. Wilbank Decl. ¶¶ 13, 14.

The asset purchase agreement provided for the sale, *inter alia*, of Gypsy's equipment, sales contracts, intellectual property, goodwill, and other assets on hand. Mobley Decl. Ex. 21 ("APA") § 1.1. The agreement excluded from sale certain assets and contracts to be included on a schedule, which was never completed or produced in discovery. APA § 1.2. In exchange, TG would immediately pay off up to $300,000 in liabilities, provide Wijnterp and Wilbrink an equity stake in TG, and make them board

5

members of the company.  APA § 1.5; Ex. E.  Additionally, the two men signed employment agreements with TG, making Wilbrink Chief Operating Officer and Director of Business Development and Wjnterp CEO and Chief Creative Director.  Press Decl., Exs. 20, 21.  TG also agreed to assume certain of Gypsy's liabilities, including accounts payable, liabilities associated with contracts purchased in the sale, and a set of liabilities listed on a schedule, which was never completed or produced in discovery.  APA § 1.3.

The agreement set March 31, 2014 as the "closing" date of the transactions listed in it.  APA § 1.4.  The parties were to exchange asset and liabilities at that time, along with associated certificates and other documentation.  APA §§ 6.1–6.3.  All schedules mentioned in the agreement, including the list of liabilities to be excluded, were to be completed by the parties prior to the closing.  APA § 6.4.  Before the closing, TG promised to raise $1.7 million in capital for the operation of the company and for payment of expenses associated with the acquisition.  APA § 7.3.  The parties agreed to construe the agreement according to Texas law, and agreed that the agreement canceled any prior agreements between the two companies.  APA §§ 12.6, 12.4.

Deitrick was mentioned in the agreement, as well.  Section 2.16 identified Deitrick as Gypsy's broker and provided that he be paid up to $120,000 in cash along with stock options equivalent to just over two percent of TG.  Deitrick, however, was never a party to the agreement and did not sign it.

When he found out what had happened, Deitrick emailed Wilbrink and expressed his displeasure with the signing:

> Terrible job Evert.  You followed none of my advice.  I have no idea what happened in Texas last week with Cibolo.
>
> I told you to hire one lawyer to represent you/Teye/the company in the deal.  I said have that lawyer talk to me.  I suggested a lawyer in New York who is good.  They nor I ever heard from you.
>
> I told you to send me any closing docs by email for the close so I could review them and discuss with the lawyer and Cibolo.
>
> I told you to conference call me in for the close.

6

> I told you to update me on the close.
>
> I have no idea what you agreed to, what documents you signed or what lawyer you used if any.

Press Decl. Ex. 22.

### D. The Failure of the Acquisition

The acquisition initially proceeded as planned. Cibolo raised the $800,000 in loans and Deitrick was paid back for his bridge loan. Wilbank Decl. ¶ 15. Over the next six months, TG hired managers to run Gypsy's operations and manage relationships with vendors. Wilbank Decl. ¶ 16. Eventually, TG began paying Gypsy's employees directly, rather than through Gypsy's payroll, and TG moved operations to a new manufacturing facility. Wilbank Decl. ¶¶ 18–20.

But not all went smoothly. TG began to discover that Gypsy had more liabilities than previously thought, and efforts to finalize the details of the asset purchase agreement prior to closing were unsuccessful. Deitrick Dep. 121:18–123:24; Mobley Decl. Ex. 24. TG and Gypsy made several attempts to amend the asset purchase agreement, but they were unable to do so. Mobley Decl. Exs. 22–24. Gypsy began to suspect that TG would not be able to raise the $1.7 million in capital promised in the asset purchase agreement, and TG managers began to take responsibility from both Wilbank and Wijnterp. Mobley Decl. Ex. 24; Wilbank Decl. ¶ 21. March 31, 2014 came and went without the deal fully closing.

Tensions came to a head in October 2014, when Gypsy sent a formal letter to TG alleging several breaches of the asset purchase agreement and declaring it "null and void." Mobley Decl. Ex. 26. It threatened litigation and called on TG to meet with Gypsy to discuss a resolution to the dispute. They came to such a resolution in December 2014 through a settlement agreement. Mobley Decl. Ex. 27. The agreement provided for the return of, *inter alia*, Gypsy's intellectual property, tools, and inventory. TG also gave Gypsy a promissory note worth $160,000 and agreed to pay any liabilities under existing contracts.

### E. Deitrick's Demands

Meanwhile, Deitrick still had not been paid his fee. While TG and Gypsy were pursuing and then unwinding the acquisition, he reached out to Wilbank and Purifoy to inquire when he would receive his money. Deitrick Dep. 139:21–25. Purifoy asked for more time to pay the fee, citing cash flow issues at TG. Deitrick Dep. 140:1–6. Purifoy also offered to pay Deitrick $125,000, but Deitrick rejected that offer. Deitrick Dep. 141:12–14.

In April 2014, Deitrick formally demanded via email from Gypsy the payment of his fee, which he set at $170,000 in cash, "10% stock," and $10,000 in expenses. In response, Wilbank wrote:

> Please be advised that the pending deal between the Gypsy Guitar Corporation and your party Cibolo Capitalgroup [sic] yet has to close.
>
> The eventual financial compensation was renegotiated and agreed to between Cibolo's Win Purifoy and yourself at the Dallas office.
>
> As per request of Win Purifoy I am asking you to direct your communication to Cibolo.

Ex. 38.

As of today, both Gypsy and TG separately remain in existence. TG reported losses of nearly $30,000 in 2013, over $540,000 in 2014, and nearly $40,000 in 2015. Mobley Decl. 29–31. Deitrick has separately filed suit against Gypsy for breaching its agreement with him. *See Deitrick v. Gypsy Guitar Corp*. No. 16 Civ. 616 (ER) (S.D.N.Y.).[6]

## II. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-

---

[6] Although this Court denied Gypsy's motion to dismiss in that case, No. 16 Civ. 616, Doc. 59, the suit has not proceeded into discovery because Gypsy is currently without counsel after its previous counsel withdrew.

moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* (internal quotation marks omitted). The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (citing *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)). But "[w]hen the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Jaramillo*, 536 F.3d at 145.

### III. DISCUSSION

Deitrick argues that he may recover his fee from Cibolo and TG in three ways. First, he claims that he was damaged when Cibolo allegedly breached its non-disclosure agreement with him by communicating directly with Gypsy during the negotiation and due diligence process without his consent. Second, he argues that TG assumed the obligations contained in the engagement letter between himself and Gypsy via the asset purchase agreement or some other promise, and therefore TG is primarily liable for his fee. Third, he argues that if neither TG nor Cibolo assumed the engagement letter's obligations from Gypsy, then TG or Cibolo tortiously interfered with the execution of the engagement letter as between Deitrick and Gypsy, causing Gypsy to breach the letter's provisions. Finally, he argues that Cibolo and TG were unjustly enriched by his services and that equity demands they disgorge the benefits they gained therefrom.

### A. The Non-Disclosure Agreement

"In order to recover from a defendant for breach of contract, a plaintiff must prove, by a preponderance of the evidence, (1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011). Cibolo contends that it did not breach its non-disclosure agreement with Deitrich, that any breach it did commit was not the cause of Deitrich's injuries, and that any damages he might be owed through breach of the non-disclosure agreement are barred by the agreement itself.

Deitrick has created a genuine dispute of material fact as to whether Cibolo breached the non-disclosure agreement. The agreement forbids Cibolo from "dealing" with Gypsy without Deitrick's written consent. In his sworn declaration, Wilbank, in support of Deitrick, claims that Cibolo executives instructed him to not include Deitrick in negotiations, and in emails Wilbank indicated that Cibolo executives and Wijnterp had spoken without Deitrick present. Indeed, the asset purchase agreement itself was signed outside of Deitrick's presence, and Deitrick, through his email to Wilbank afterwards, clearly objected.

But this breach did not cause Deitrick to not receive his fee. "Causation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach *directly and proximately caused* his or her damages." *Diesel Props*, 631 F.3d at 52–53 (internal quotation and citation removed).

Deitrick argues that because Cibolo dealt directly with Gypsy without his consent, Cibolo "dup[ed] Gypsy into executing a version of the APA which did not incorporate Purifoy's [oral] promise that Cibolo/TG would pay Mr. Deitrick's investment banking fee and expenses directly." Opp. at 22. Deitrick has pointed to no evidence in the record that the deal would have included his preferred fee arrangement if he had been in the room in

October 2013. And the evidence does not show at all that Cibolo excluded Deitrick from the meeting; rather, the evidence shows that his client, Wilbrink, failed to inform Deitrick that the signing was happening and to take the steps necessary for Deitrick to be present. The email Deitrick sent after the signing of the agreement blames Wilbank for not adding him via phone to the signing, consulting with a lawyer, or otherwise updating Deitrick on the close. Furthermore, Wilbank does not identify in his declaration that he was instructed to exclude Deitrick from the signing itself, and the email record shows that even when Deitrick was "excluded," he was updated on the conversations after the fact.

Even if Cibolo's breach had caused Deitrick to suffer damages, the terms of the non-disclosure agreement prevent Deitrick from being liable for this type of damages. The agreement specifically cites "lost revenues, loss of profits, [and] loss of business" as types of damages that may not be recovered via lawsuits brought under the agreement. Because these are precisely the type of damages Deitrick seeks here, he is barred from recovering them under the non-disclosure agreement. "It is axiomatic that parties to a contract must remain free to allocate risks and shield themselves from liability." *McNally Welman Co. v. N.Y. State Elec. & Gas Co.*, 63 F.3d 1188, 1195 (2d Cir. 1995). This Court will respect the deal struck by the parties in the signing of this non-disclosure agreement and dismiss Deitrick's First Claim for Relief in his First Amended Complaint.

### B. The Assumption of the Engagement Letter

Deitrick next attempts to make TG liable for the obligations under his engagement letter with Gypsy by arguing that TG assumed the engagement letter through the asset purchase agreement or some other promise.[7] His arguments are unavailing and, in one instance, entirely improper at this stage in the litigation.

---

[7] Deitrick asserts that he earned his fee as of the signing of the asset purchase agreement on October 18, 2013. There is at least a genuine dispute of material fact on this point with this record, and the Court will assume it to be true for the purposes of this motion.

11

### *1. Assumption via the Asset Purchase Agreement*

He initially argues that TG assumed the engagement letter's obligations through section 1.3(a) of the asset purchase agreement. This argument fails for two reasons. First, and simply, the assumption of liabilities was to occur on the "closing" as defined in the agreement, but the "closing" never occurred.[8] Because the closing never occurred, TG never assumed Gypsy's liabilities, including any that might have been included under the engagement letter.

Second, in Texas (the law of which is chosen by the asset purchase agreement), an entity that acquires the assets of another "may not be held responsible or liable for a liability or obligation of the transferring [party] that is not expressly assumed by the [entity]." Tex. Bus. Orgs. Code Ann. § 10.254; *see also In re 1701 Commerce, LLC*, 511 B.R. 812, 823 (Bankr. N.D. Tex. 2014) ("Texas strongly embraces the general rule that a successor entity in an asset transfer is not liable for the grantor's liabilities."). The asset purchase agreement does not explicitly identify the engagement letter as a liability to be assumed and no schedule where it might have been included was completed or produced in discovery. Although Deitrick argues that such omissions make the contract ambiguous on this point, the Court reads it to be, on the contrary, quite clear: the schedules are not before the Court and therefore neither are the additional liabilities to be assumed.

### *2. Assumption via Oral Promise Made by TG to Gypsy*

Deitrick next argues that TG orally promised Gypsy that it would assume liability for the engagement letter as part of the negotiation of the asset purchase agreement. But even if such a promise had occurred, it would be rendered void by the agreement, which states that it is contains the whole agreement between the parties and cancels any prior agreements. *See* APA § 12.4.

---

[8] Detrick points to internal TG notes that suggest a new deal was negotiated and closed in April 2014, Press Decl. Ex. 33, but he has not produced any signed contract in discovery or produced evidence of its terms sufficient for a reasonable jury to find that the deal caused TG to assume the obligations within the engagement letter.

### *3. Assumption via Oral Promise Made by TG to Deitrick*

In his opposition memorandum, Deitrick brings another reason why TG might be liable for the obligations in the engagement letter: TG (through Purifoy) made a separate oral contract with Deitrick promising to pay his fee if Deitrick gave Gypsy a bridge loan of $43,700. This promise was not alleged in either the initial Complaint or the First Amended Complaint. Through this argument, he is improperly attempting to amend his complaint for a second time; the Court will not entertain claims raised in this manner as "[i]t is well settled that a party may not amend its pleadings in its briefing papers." *Enzo Biochem, Inc. v. Amersham PLC*, 981 F. Supp. 2d 217, 223 (S.D.N.Y. 2013) (citing *Avillan v. Donahoe*, 483 F. App'x 637, 639 (2d Cir.2012 and *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998)).

Even if the Court were to consider this argument, it would fail to grant Deitrick the relief he seeks under New York or Texas law.[9] In New York, "a contract to pay compensation for services rendered . . . in negotiating the purchase . . . of a business opportunity, business, its good will, inventory, fixtures or an interest therein" must be in writing to be enforceable. N.Y. Gen. Oblig. Law § 5-701(10). A promise to pay Deitrick's broker falls squarely within this provision and so would be unenforceable; Deitrick has provided no authority suggesting otherwise.

Under Texas law, such a promise would also be unenforceable because it is "a promise by one person to answer for the debt, default, or miscarriage of another person" — that is Gypsy's debt to Dietrich. Tex. Bus. & Com. Law. § 26.01(2). Dietrich, implicitly via a footnote, argues that this promise would fall under Texas' "main purpose" exception to the statute because "(1) [TG] intended to create primary responsibility in itself to pay the debt; (2) there was consideration for the promise; and (3) the

---

[9] New York law most likely applies to the question of whether an oral contract is enforceable because the engagement letter dictates New York law as applicable in any action "that may be based upon, arise out of or relate to [the engagement letter], or the negotiation, execution or performance of [the engagement letter]." Engagement Letter § 10. The result, however, is the same under either Texas or New York law, as discussed above.

consideration given for the promise was primarily for [TG's] own use and benefit — that is, the benefit it received was [TG's] main purpose for making the promise." *Dynegy, Inc. v. Yates*, 422 S.W.3d 638, 642 (Tex. 2013).

But this exception does not apply because, among other reasons, the consideration given, the bridge loan, was not for TG's benefit — it was for *Gypsy's*. As Purifoy said at the time, the purpose of the bridge loan was to show that Deitrick "had skin in the game," and, in any event, TG had yet to be formed at the time Deitrick extended the loan to Gypsy.

* * *

Accordingly, there is no basis for finding that TG assumed the liabilities of the engagement letter or otherwise separately promised to pay Deitrick's fee. The First Amended Complaint's Third Claim for Relief is dismissed.

### C. Tortious Interference with the Engagement Letter

A claim of tortious interference with a contract has six elements in New York:

(1)　the existence of a contract;
(2)　defendants' knowledge of that contract;
(3)　defendants' intentional inducement of a breach of that contract;
(4)　a breach;
(5)　but for the defendants' actions, that contract would not have been breached; and
(6)　damages.

*Conte v. Emmons*, 895 F.3d 168, 171 (2d Cir. 2018); *see also NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc.*, 664 N.E.2d 492, 495 (N.Y. 1996).

The parties here do no dispute the existence of the engagement letter, and the Court finds that there is a genuine dispute of material fact as to the defendants' knowledge of it and its provisions.[10] As discussed in *supra* note 7, there is at least a

---

[10] Specifically, Cibolo asked for Gypsy's contract with Deitrick during the due diligence process, and Cibolo signed a similar contract on a separate deal with Deitrick in 2014.

14

dispute of material fact over whether Gypsy breached the engagement letter by not paying Deitrick's fee, and, similar to the discussion in *supra* Part III.A, there is a dispute over whether Gypsy breached its non-circumvention promise. The damages in this case would be, of course, Deitrick's fee.

But whether the defendants intentionally induced a breach and whether *that* intentional inducement caused the breach are closer questions. As an initial matter, TG and Cibolo, quoting *Rosario-Suarz v. Wormuth Bros. Foundry Inc.*, 649 N.Y.S.2d 225, 227 (N.Y. App. Div. 1996), argue that Deitrick must establish that its "procurement of the alleged breach was solely malicious." But proof of malice is only required in allegations of tortious interference of *prospective* contract rights, not *existing* contract rights.[11] *See NBT Bancorp*, 664 N.E.2d at 496; *see also EVEMeta, LLC v. Siemens Convergence Creators Corp.*, 104 N.Y.S.3d 607, 610 (N.Y. App. Div. 2019) ("Malice is not an element of tortious interference with contract."). For the Court to sustain Deitrick's claim, it need only find there was intentional inducement of a breach.

And the Court finds there is a genuine dispute of material fact concerning one such inducement. According to Wilbank, Purifoy instructed him not to discuss the payment of Deitrick's fee with Deitrick, and Wilbank's email to Deitrick when Deitrick made his formal demand supports this account. Such an instruction is no different than simply ordering Wilbank not to pay the fee, an order that is sufficient to support a claim of tortious interference. *See MGR Meats, Inc. v. Schweid*, No. 10 Civ. 3068 (MKB), 2012 WL 6675123, at *4 (E.D.N.Y. Dec. 21, 2012).

But the Court must also find that this order *caused* the breach to hold TG or Cibolo liable. Deitrick has not presented such evidence. The record does not indicate

---

[11] *Conte*, cited by Deitrick, is not to the contrary. There, the Second Circuit indicated that a "contract-based claim carries a lesser culpability requirement than the more general business-relations claim." 895 F.3d at 172. The lack of indication of malice used in dismissing the claim against law enforcement for interfering in a contract was used to show that the defendants did not purposefully intend to breach the contract at issue. *See id.* at 173. The lack of malice was not an independent basis for dismissal.

15

that Purifoy ordered Wilbank to avoid discussing Deitrick's fee with the broker until well after the October 18, 2013 signing of the asset purchase agreement, that is, when Deitrick's fee was due and Gypsy initially breached the agreement contained in the engagement letter.

To the contrary, the record conclusively indicates that Gypsy made its own decision to not pay Deitrick's fee. It willingly signed a deal with TG that contained less cash consideration than initially anticipated when Gypsy signed the agreement with Deitrick — a decision for which Deitrick blamed Wilbank. There is no indication that anyone at TG or Cibolo ordered or otherwise prevented Gypsy from paying the fee it owed to Deitrick at any time preceding or immediately following the execution of the asset purchase agreement. Indeed, to this day — seven years later — Gypsy has failed to pay or even attempt to pay the fee.

Deitrick argues that the defendants also interfered with the engagement letter by inducing Gypsy to breach the non-circumvention clause of the engagement letter. But, unlike with the order to not talk to Deitrick about paying fees, there is no evidence that either defendant had the intention of inducing Gypsy to breach this contract clause — it was merely incidental to the process of negotiating the asset purchase agreement.

Accordingly, the Court grants the defendants motion for summary judgment and dismisses Deitrick's Second Claim for Relief.

### D. Unjust Enrichment

"To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (internal quotation marks and citation omitted). "The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates in the absence of any agreement." *Id.* (quoting *Goldman v. Metropolitan Life Ins. Co.*, 841 N.E.2d 742, 746 (N.Y. 2005).

Insofar as Deitrick argues that the Court should infer a quasi-contract between Gypsy and TG or Cibolo assuming the obligations of the engagement letter, the Court finds that the subject matter of such a quasi-contract is governed by the engagement letter itself. *See Beth Israel*, 488 F.3d at 586. A theory of unjust enrichment is unavailable to Deitrick here.

And any quasi-contract between Deitrick and TG or Cibolo is doomed by New York's statute of frauds,[12] which mandates that the terms of any agreement involving a broker must be in writing. *See* N.Y. Gen. Oblig. L. § 5–701(a)(10). This bar applies to claims brought under theories of unjust enrichment, as well. *See Tower Intern., Inc. v. Caledonian Airways, Ltd.*, 969 F. Supp. 135, 139 (E.D.N.Y. 1997), *aff'd*, 133 F.3d 908 (2d Cir. 1998) (citing *Bradkin v. Leverton*, 257 N.E.2d 643, 646 (N.Y. 1970)).

Even if such a quasi-contract were enforceable, Deitrick has failed to point to any benefit TG or Cibolo enjoyed as a result of his services. According to TG's tax returns, it lost money in 2013, 2014, and 2015; Deitrick has not shown any evidence, other than a conclusory assertion that TG sold many guitars, that TG or Cibolo have received any profits from the deal to disgorge. Accordingly, the defendants' motion to dismiss the Fourth Claim for Relief is GRANTED.

## IV. CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is GRANTED in its entirety. All claims in Deitrick's First Amended Complaint are

---

[12] Neither party has argued that Texas law applies to the unjust enrichment claim. Because the parties have briefed this matter citing New York law, the Court deems that the parties have impliedly consented to its application. *See Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000).

DISMISSED. The Clerk of Court is respectfully directed to terminate the motion, Doc. 43, and close the case.

It is SO ORDERED.

Dated: January 30, 2020
       New York, New York

                                                    EDGARDO RAMOS, U.S.D.J.